Affirmed and Opinion filed October 5, 2006








Affirmed
and Opinion filed October 5, 2006.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00363-CV

____________

 

KENNEDY SHIP & REPAIR, L.P., Appellant

 

V.

 

DRANSON CHARLIE PHAM, Appellee

 



 

On Appeal from the 56th
District Court

Galveston County, Texas

Trial Court Cause No. 02-CV-0244

 



 

O P I N I O N

Appellant, Kennedy Ship & Repair, L.P. (AKennedy Ship@), appeals the
judgment entered in favor of appellee, Dranson Charlie Pham (APham), on his
breach of contract claim.  We affirm.  

                                                I.  Background








On January 4, 2001, Kennedy Ship and Pham entered into a
contract under which Kennedy Ship agreed to build a commercial shrimp trawler
for Pham for a purchase price of $808,000.  The contract provided for a
delivery date of June 2001, in time for shrimping season.  In January 2001,
Pham made a $50,0000 down payment on the shrimp trawler.  The contract provided
that the first payment of $50,000Cafter the down
paymentCwas due Awhen hull erection
[is] completed,@ the second payment of $50,000 was due one
month from the date of the first payment, the third payment of $50,000 was due
two months from the date of the first payment, and the fourth payment of
$608,000 was due Aupon completion from bank loan.@ 

On April 12, 2001, Kennedy Ship wrote Pham that the hull
had been erected and Pham was $100,000 overdue on his contract.  On April 18,
2001, a $50,000 payment was made to Kennedy Ship on behalf of Pham.  On July
23, 2001, Kennedy Ship wrote Pham again that he was $100,000 overdue on his
contract and his Ahull position has been lost unless payment
arrangements have been made and agreed upon in the next fifteen days.@  On August 21, 2001,
Kennedy Ship informed Pham that it was Aproceeding with
the construction of the hull for a new purchaser.@  In September
2001, Pham tried to make a payment on the shrimp trawler, but was told by Chris
Kennedy, the general partner of Kennedy Ship, that the hull had been
transferred to another purchaser.  

Pham sued Kennedy Ship for breach of contract and Kennedy
Ship counterclaimed against Pham for breach of contract.[1] 
The jury found Kennedy Ship had failed to comply with its agreement to build a
commercial shrimp trawler for Pham, and Pham had failed to comply with his
agreement to purchase a commercial shrimp trawler from Kennedy Ship.  The jury
found Pham=s failure to comply was excused by Kennedy Ship=s previous failure
to comply with a material obligation of the same agreement, but Kennedy Ship=s failure to
comply was not excused.  The jury awarded Pham $100,000, which was the amount
Pham had paid to Kennedy Ship, on his breach of contract claim.








On appeal, Kennedy Ship claims (1) the evidence is legally
and factually insufficient to support the jury=s finding that it
breached its agreement with Pham, (2) the jury=s finding that it=s performance of
the contract was not excused from performance is against the great weight and
preponderance of the evidence, (3) the evidence is factually insufficient to
support the jury=s finding that Pham=s performance of
the contract was excused, and (4) the trial court erred in not including an
instruction on material breach in the jury charge.  

                                       II.  Kennedy Ship=s Breach

                                               A. 
Legal Sufficiency

In its first issue, Kennedy ship challenges the legal
sufficiency of the evidence to support the jury=s finding that it
breached the agreement to build a commercial shrimp trawler for Pham.  When
reviewing the legal sufficiency of the evidence, we review the evidence in the
light most favorable to the challenged finding and indulge every reasonable
inference that would support it.  City of Keller v. Wilson, 168 S.W.3d
802, 822 (Tex. 2005).  We credit favorable evidence if a reasonable fact finder
could, and disregard contrary evidence unless a reasonable fact finder could
not.  Id. at 827.  The evidence is legally sufficient if it would enable
fair-minded people to reach the verdict under review.  Id.  

Because the appellate court is not the fact finder, it may
not substitute its own judgment for that of the trier of fact, even if a
different answer could be reached on the evidence.  Maritime Overseas Corp.
v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998); Grey Wolf Drilling Co. v.
Boutte, 154 S.W.3d 725, 733B34 (Tex. App.CHouston [14th
Dist.] 2004, pet. dism=d by agr.).  The amount of evidence
necessary to affirm the judgment is far less than necessary to reverse a
judgment.  Bracewell v. Bracewell, 20 S.W.3d 14, 23 (Tex. App.CHouston [14th
Dist.] 2000, no pet.).  








                             1.  American Bureau of
Shipping Standards

Kennedy Ship contends the evidence is not legally to
support a finding that it breached the contract because the shrimp trawler was
not classed and certified by the American Bureau of Shipping (AABS@).  The American
Bureau of Shipping (AABS@) is a
classification society whose purpose is to promote certain standards within the
shipping industry.  

The contract
between Kennedy Ship and Pham provided:

Classifications and Certificates:                  Admeasurement
under 200 gross tons.

Built to ABS
standards.

Although neither
party pleaded ambiguity, the trial court determined the above quoted contract
term was ambiguous and, accordingly, instructed the jury:

It is your duty to interpret the following language
of the agreement:  AClassifications and Certificates: 
Built to ABS standards[.]@

You must decide
its meaning by determining the intent of the parties at the time of the
agreement.  Consider all the facts and circumstances surrounding the making of
the agreement, the interpretation placed on the agreement by the parties, and
the conduct of the parties and any trade customs.[2] 


Kennedy Ship argues that the plain language of the contract
states it would build the boat to ABS standards, not that the boat would be
classified or certified by the ABS as argued by Pham.  Even under Kennedy Ship=s interpretation
that it was not obligated to have the vessel ABS classed and certified, but
only that it would build it to ABS standards, we conclude the evidence is
legally sufficient to support a jury finding that Kennedy Ship did not build
the shrimp trawler to ABS standards.  








Ken Tamura, the manager of the Rules and Standards
Department at the ABS, described the process for obtaining ABS classification
and certification for a vessel.  First, an application of the classification
request must be submitted to the ABS, which reviews it to make sure it is
appropriate for classification and the ABS issues the verification.  The design
for the vessel is then submitted to the ABS for its review to make sure it is
in compliance with ABS rules and standards.  After the ABS approves the design
and the vessel is under construction, an ABS surveyor is stationed periodically
at the construction site to verify that the construction complies with the
approved design and that materials used in the construction meet ABS
standards.  After the construction has been completed, the ABS surveyor issues
a certificate stating the vessel complies with ABS standards.  Tamura stated
that a builder can use ABS standards without having the vessel actually
classified by the ABS, but the ABS will not have any involvement.  

Chris Kennedy testified he told the naval architecture
firm, DNC, located in Mobile, Alabama, that although the vessel would not be
ABS classed, he still wanted the vessel designed to meet ABS standards.  Dean
Hartmann, the naval architect who designed this shrimp trawler, testified the
boat was designed to comply with U.S. Coast Guard safety regulations, but
admitted Coast Guard rules are not identical to the ABS rules and regulations
for the construction of vessels, and a boat built to Coast Guard specifications
or requirements may not necessarily meet ABS requirements.  

Hartmann stated that he used ABS rules for building and
classing steel vessels under 90 meters, but not every section in the rules
would apply to this vessel.  Hartmann testified the boat=s longitudinal
strength, shell plating, deck plating, bottom structure, side frames, keel,
beams, deck girders, deck traverses, pillars, deep tanks, stern frames, shaft
struts, box rails, dream ports, port lights, window ventilators, and tank vents
meet ABS standards. 








Hartmann said the hull structure was intended to meet ABS
standards, but he did not claim other aspects of the boat complied with ABS
standards.  For example, Hartmann could not testify that certain systems, i.e.,
the electrical system, piping, machinery, outriggers, sewer pipes,
refrigeration, and hydraulics met ABS standards.  In fact, many of the hull
accouterments were not included in Hartmann=s plans, but,
instead, were yard-designed.  

Sonny Bosworth, who worked for Kennedy Ship as a supervisor
or Atroubleshooter,@ was involved in
the construction of the first two shrimp trawlers Kennedy Ship had under
contract, but not the one for Pham.  However, according to Hartmann, all the
shrimp trawlers were based on the same design and should have been identical. 
Thus, Hartman said he would expect a design defect to carry through the entire
line of vessels.  Bosworth testified there were a number of problems with the
design of the shrimp trawler.  For example, Bosworth explained there was too
much water and fuel at the bow with no bouyancy, i.e, an air tank at the bow to
carry the weight of the boat.  According to Bosworth, this had to be modified
because if the front tank had been filled with fuel and water, the boat would
not have been able to carry the weight.  

Hartmann disagreed with Bosworth with regard to bouyancy. 
Hartmann explained there was no bouyancy chamber in the original design because
there is no such thing as a bouyancy chamber.  Hartmann testified the vessel
did well in the stability test.  However, when Hartmann conducted the stability
test on one of the boats based on his design, he was not aware that a Abouyancy chamber
had been cut into the design@ and the vessel had been modified in
accordance with Bosworth=s recommendation.  

Bosworth also testified there was a problem with the motor
bed.  The motor bed is the framework on which the engine is placed.  The engine
did not fit in the motor bed properly and Bosworth had to cut the motor bed out
in the back and modify the motor bed so that the motor could be lined up
properly with the propeller shaft.  Hartmann disagreed with Bosworth that there
was any problem with the motor bed or that the engine would not fit.








Hartmann=s design specified Agrade A 36@ steel.  However,
not all grade A 36 steel is approved by the ABS.  The ABS inspects, and stamps
its approval on, all steel used in ABS classed vessels.  Hartmann did not know
if any of the steel used in the construction of Kennedy Ship=s boats was actually
approved by ABS and the ABS did not survey the construction of these vessels.  

Bosworth testified
not all of the steel was ABS certified because it did not have the ABS
markings.  On the other hand, Kennedy testified all the steel on the vessel was
ABS certified.  Kennedy stated that the steel was stamped as certified by the
ABS, but explained why the certification stamps would not be visible:

You wouldn=t be able to see
it at this time.  There are stamps, but after it=s painted you
wouldn=t see it.  And we
also receive paperwork from the steel company.  In this case we purchased all
the plates from O=Neal, and they would supply us ABS A36
sheets that would guarantee that it was ABS plate. . . . That=s all the plate
that makes the entire vessel: Around the hull, deckhouse, pilothouse, main
deck, interior bulkheads, everything.  

Hartmann testified the ABS has very specific rules and
regulations with respect to the types of welds used in the construction of
vessels and its inspection process regarding welds.  Hartmann explained that
his design did not provide any specifications comparable to ABS specifications
regarding welds and he has no way of knowing whether the welds on the vessel
are compliant with ABS standards.  

Finally, a survey
of one of the shrimp trawlers built by Kennedy Ship noted some problems, including
the vessel=s inability to carry a Aload line,@ the incorrect
mounting of the generators that could potentially damage the main engines= bearings, and the
aft engine room bulkhead=s not being watertight:

Vessel=s builder reports that the vessel
hull is built to American Bureau of Shipping standards although the machinery
is not classed nor will she carry a load line.

                                                    *       
*        *

Vessel=s owner is to be made aware that
the mounting of the generators to the same foundation as the main engines will,
thru vibration when the main engines are not running potentially damage the
main engines= bearings with resultant reduction
in operating hours between overhauls of the main engines.








This common mounting of the generators and main engines on the same
foundation is not to best marine practice and should have been avoided.

                                                    *       
*        *

At time of inspection, vessel=s aft engine room
bulkhead was noted not watertight.

The fact that Dean Hartmann, who designed the shrimp
trawler, could not state that the entire vessel would meet ABS standards, the
fact that Sonny Bosworth encountered a number of serious design flaws in the
construction of the shrimp trawler, and the fact that a survey conducted on the
shrimp trawler noted problems are legally sufficient to support a finding that
Kennedy Ship did not construct the shrimp trawler in accordance with ABS
standards and, thus, breached its contract with Pham. 

                               2. 
Timeliness of the Delivery of the Boat

Kennedy Ship contends the evidence is legally insufficient
to support a finding that it breached the contract by failing to timely deliver
the boat to Pham.  Kennedy Ship argues that while the contract states delivery
was for June 2001, Kennedy Ship argues the contract did not make time of the
essence.  








Ordinarily, time is not of the essence.  Municipal
Admin. Servs., Inc. v. City of Beaumont, 969 S.W.2d 31, 36 (Tex. App.CTexarkana 1998, no
pet.); Superior Signs, Inc. v. American Sign Servs., Inc., 507 S.W.2d
912, 915 (Tex. Civ. App.CDallas 1974, no writ).  Also, a date
stated for performance does not mean time is of the essence.  Cadle Co. v.
Castle, 913 S.W.2d 627, 637 (Tex. App.CDallas 1995, writ
denied); Shaw v. Kennedy, Ltd., 879 S.W.2d 240, 246 (Tex. App.CAmarillo 1994, no
writ).  Instead, the contract must expressly make time of the essence or there
must be something in the nature or purpose of the contract and the
circumstances surrounding it making it apparent that the parties intended that
time be of the essence.  Municipal Admin. Servs., Inc., 969 S.W.2d at
36; Siderius, Inc. v. Wallace Co., 583 S.W.2d 852, 863 (Tex. Civ. App.CTyler 1979, no
writ).  Unless the contract expressly makes time of the essence, the issue is a
fact question for the jury.  Siderius, Inc., 583 S.W.2d at 863.  

We agree with
Kennedy Ship that while the contract stated a delivery date of June 2001, the
contract did not express that time was of the essence.  However, in light of
the nature or purpose of the contract, i.e., building a vessel to be used for
shrimping, and the surrounding circumstances, we find time was of the essence. 
Pham testified the June 2001 delivery date was A[v]ery important.
. . . Because that is right in the season and then I can make money to pay back
my debts.@  Likewise, Chris Kennedy knew the purchasers of
shrimp trawlers wanted the boats for shrimp season, which begins in July, and
the shrimpers needed income from shrimping in order to make payments on the
boats.  Chris explained:  

All of the fishermen ask for
delivery dates prior to fishing season . . . There was [sic] requests made by
fisherman to have the vessel before the fishing season so that they wouldn=t have to make
payments during the winter, so that was a theme throughout the building of
these vessels is that all the fishermen wanted to have the vessel just prior to
[the] opening of the season so they could make that season.  The payments for
these vessels usually ran 14 to $16,000 a month and, therefore, they did not
want to make those payments when the boat wasn=t making money.  

Kennedy also argues time was not of the essence because,
after the June 2001 deadline was not met, Pham elected to affirm the agreement
and continue to seek performance by requesting Kennedy Ship build the boat and
deliver it by December 2001.








A time of the essence provision may be waived.  17090
Parkway, Ltd. v. McDavid, 80 S.W.2d 252, 255 (Tex. App.CDallas 2002, pet.
denied); Intermedics, Inc. v. Grady, 683 S.W.2d 842, 846 (Tex. App.CHouston [1st
Dist.] 1984, writ ref=d n.re.).  The acceptance of late
performance may indicate that it was not intended that time be of the essence. 
Superior Signs, Inc., 507 S.W.2d at 915.  AA waiver of time
of performance of a contract will result from any act that induces the
opposite party to believe that exact performance within the time designated in
the contract will not be insisted upon.@  Laredo Hides
Co. v. H & H Meat Prods. Co., 513 S.W.2d 210, 218 (Tex. Civ. App.CCorpus Christi
1974, writ ref=d n.r.e.) (emphasis added).

After receiving the July 23, 2001 letter, Pham saw Chris
Kennedy.  Pham told Kennedys he would give him more money when the hull was
finished and had been turned.  Pham still wanted the vessel and, in September,
when Pham saw that the hull had been turned, he approached Chris Kennedy,
offering a $50,000 payment, but, instead, was told by Chris that A you have lost
your boat already.@  

Chris testified that he transferred Pham=s hull to another
customer, Christopher Tran, in August 2001.  However, there is evidence to
support a finding that Kennedy Ship had already transferred the hull to Tran in
May 2001.  Tran and Kennedy Ship entered a contract on February 19, 2001. 
According to Chris, Tran paid $10,000 to hold a hull position because there
were already contracts for the construction of five other boats ahead of Tran
and there was no room at the yard to start a boat for Tran.  Chris explained
that under Tran=s contract, a $50,000 down payment would
be due when Kennedy Ship started on a hull for Tran or transferred a hull to
Tran from another buyer.  On May 1, 2001, Tran paid Kennedy Ship $50,000 via
wire transfer.  When Tran made his $50,000 payment on May 1, 2001, Kennedy Ship
had three hulls under constructionCPham=s and two others. 
Thus, when Tran wired the $50,000 payment for a fourth hull, there were only
three hulls under construction.  

Chris denied that
Kennedy Ship was taking money from both Pham and Tran for the same vessel, but
admitted that Kennedy Ship was taking money from four fishermen when only three
hulls were under construction.  Chris stated that he would only accept $50,000
from a fisherman if Kennedy Ship were going to start building a boat for that
fisherman, but he could not offer any explanation for taking a $50,000 payment
from Tran:

                   Q.  How do you
explain to the jury that you are accepting money from four different fisherman
when you only have three hulls under construction?

A.  Because Christopher [Tran] was taking over Charlie=s [Pham] position.








Q.  Okay.  Then that means that you were transferring Charlie=s [Pham] boat to Christopher [Tran]
in May, not in August as you testified earlier; right?

A.  I don=t know.  I mean, I don=t know about -- I didn=t personally request that $50,000
be wired.  There was other negotiations that went on there.  There was a
special agreement made with Christopher [Tran] that he signed.  

                                                    *       
*        *

Q.  Then do you have any other explanation for why you are accepting
$50,000 from Christopher Tran at the same time you are accepting money from
Charlie Tran [sic] [Pham], Joe Nguyen, and Chau Nguyen?

A.  No.  

                                                    *       
*        *

Q.  Who=s [sic] hull was Christopher Tran
taking when he wired that $50,000 to you?

A.  Charlie=s [Pham].  

Roxanne Kennedy testified that the purpose of the May 2001
$50,000 payment from Tran was to secure Tran=s position on Pham=s hull ahead of
other contracts that could potentially take over Pham=s hull in the
event that Pham did not come through with his payments.  Tran, however,
testified that his $50,000 payment in May 2001, was not an additional deposit. 


Therefore, in light of evidence that Kennedy Ship had
already transferred the hull under Pham=s contract to
another purchaser in May 2001, Pham could not have induced Chris Kennedy, in
September 2001, into believing that Aexact performance
within the time designated in the contract w[ould] not be insisted upon.@  Laredo Hides
Co., 513 S.W.2d at 218.  The evidence is legally sufficient to support a
finding that the parties intended that time be of the essence and that Kennedy
Ship breached the contract by failing to timely deliver the boat to Pham in
June 2001.  Kennedy Ship=s first issue is overruled.  








                                B.  Factual Sufficiency
of the Evidence

In its second issue, Kennedy Ship claims the evidence is
factually insufficient to support a finding that it breached the contract with
Pham based on its premature demand for payment from Pham and its failure to
build the boat to ABS standards.  When conducting a factual sufficiency review,
we must examine the entire record, considering both the evidence in favor of,
and contrary to, the challenged finding, and set aside the finding only if it
is so contrary to the overwhelming weight of the evidence as to be clearly
wrong and unjust.  Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986) (per
curiam). 

                                   1. 
Premature Demand for Payment

Kennedy Ship contends the evidence is factually
insufficient to support a jury finding that it breached the contract by
prematurely demanding payments from Pham.  The contract provides the first
$50,000 payment (after the down payment) was Adue when hull
erection [is] completed.@  The trial court did not expressly hold
the term Ahull erection completed@ was ambiguous,
but admitted parole evidence without objection regarding the meaning of the
term.  The trial court may conclude a contract is ambiguous, even in the
absence of such pleading by either party, and submit the ambiguity to the jury
if it was tried by consent of the parties.  Sage Street Assocs., 863
S.W.2d at 445 (citing Tex. R. Civ.
P. 67). 

Whether a contract is ambiguous is a question of law for
the court.  J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex.
2003).  We review the trial court=s legal
conclusions de novo.  MCI Telecomms. Corp. v. Texas Utils. Elec. Co.,
995 S.W.2d 647, 651 (Tex. 1999).  We determine whether the contract is
ambiguous by looking at the contract as a whole in light of the circumstances
present when the parties entered the contract.  Universal Health Servs.,
Inc. v. Renaissance Women=s Group, P.A., 121 S.W.3d 742,
746 (Tex. 2003). 








If the written instrument is so worded that it can be given
a certain or definite legal meaning or interpretation, then it is not ambiguous
and the court will construe the contract as a matter of law.  SAS Inst.,
Inc. v. Breitenfeld, 167 S.W.3d 840, 841 (Tex. 2005) (per curiam) (quoting Coker
v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)).  A contract, however, is
ambiguous when it is susceptible to more than one reasonable interpretation.  Frost
Nat=l Bank v. L & F. Distribs., Ltd., 165 S.W.3d 310,
312 (Tex. 2005) (per curiam).  

Our primary concern when interpreting a contract is to
ascertain and give effect to the intent of the parties as it is expressed in
the contract.  Seagull Energy E & P, Inc. v. Eland Energy, Inc., 49
Tex. Sup. Ct. J. 744, 2006 WL 1651684, at *2 (Tex. June 16, 2006).  To achieve
this objective, courts should examine and consider the entire writing in an
effort to harmonize and give effect to all the provisions of the contract so
that none will be rendered meaningless.  Valence Operating Co. v. Dorsett,
164 S.W.3d 656, 662 (Tex. 2005).  Contract terms are given their plain,
ordinary, and generally accepted meanings unless the contract itself shows them
to be used in a technical or different sense.  Id.  

ALack of clarity does not create an
ambiguity, and >[n]ot every difference in the
interpretation of a contract . . . amounts to an ambiguity.=@  Universal
Health Servs., Inc., 121 S.W.3d at 746 (quoting Forbau v. Aetna Life
Ins. Co., 876 S.W.2d 132, 134 (Tex. 1994)).  We may consider the parties= interpretations
of the contract through extrinsic or parol evidence only after we have first
determined that the contract is ambiguous.  Friendswood Dev. Co. v. McDade
& Co., 926 S.W.2d 280, 283 (Tex.1996) (per curiam).  Parol evidence is
not admissible for the purpose of creating an ambiguity.  National Union
Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995) (per
curiam).  








Kennedy Ship argues the terms Ahull completed@ and Ahull erection
completed@ do not have the same meaning and to conclude
otherwise would render the word Aerection@ superfluous,
void, and insignificant.  We disagree.  The plain meaning of the term Aerection@ is Aa building or
structure,@[3] or Athe act or process
of erecting something: CONSTRUCTION.@[4]  Thus, we
conclude the phrase Ahull erection completed@ means, in its
common usage, to have completed building the hull.[5] 


Kennedy Ship argues the conduct of the parties is the best
indicator of the construction they placed on contract.  Kennedy Ship argues the
first payment for Pham was made on April 18, after delivery of the April 12
letter.  Kennedy Ship argues there was no evidence before this suit was filed
that Pham had taken the position that Ahull erection
completed@ had not occurred.  Contrary to Kennedy Ship=s assertion, A[t]he objective
intent as expressed in the agreement controls the construction of an
unambiguous contract, not a party=s after-the-fact
conduct.@  In re Dillard
Dep=t Stores, Inc., 186 S.W.3d 514,
515 (Tex. 2006) (per curiam).

Even if the term Ahull erection
completed@ could be interpreted to mean the completion of only
the skeleton or ribs of the hull, without the attachment of plates, we still
find the evidence is factually sufficient to support a finding that Kennedy
Ship breached the contract by demanding the first and second payments before
they were due.  On April 12, 2001, Kennedy Ship wrote to Pham, informing him
that he was A$100,000 over due@ on his contract
and Athe hull is in
full erection.@  The first $50,000 payment was due when Ahull erected [is]
completed@ and the second $50,000 payment was due one month from
the date of the first payment.  Therefore, if Pham were over due on his
contract by $100,000, i.e., the first and second payments, then Ahull erection
completed@ would have been in early to mid-March 2001. 








Chris Kennedy testified that by writing the letter on April
12, Kennedy Ship was taking the position that 30 days before that, i.e., March
12, the hull erection was complete on Pham=s boat.  However,
Chris testified the shipyard was still working on two other hulls in March
2001, and there was no room to start Pham=s boat until those
first two hulls had been turned.  The first two hulls were turned on March 18,
2001.  When Chris was questioned about pictures from Kennedy=s Ship=s website showing
the flooding of the docks and the turning of the first two hulls on March 18,
he acknowledged that the April 12, 2001 letter representing that Pham=s hull was erect
six days before the first two hulls were turned was a misrepresentation of the
progress on his hull.[6]


Sonny Bosworth testified that Pham=s hull, along with
two other hulls, was started in April, two or three weeks after the first two
hulls had been turned.  Bosworth explained Kennedy Ship had to wait two or
three weeks after the first two hulls had been turned over because its
employees needed to clean the two Ajigs@[7] on top of which
the hulls would be built and to construct a third jig so that three hulls could
be built at one time.  Bosworth testified the Aframes@ for the second
set of hulls, including Pham=s, were finished in June 2001.  

We conclude the evidence is factually sufficient to support
a jury finding that Kennedy Ship breached the contract by prematurely demanding
the first and second payments prior to Ahull erection
completed.@

                                                2. 
ABS Standards








Kennedy Ship claims the evidence is factually insufficient
to support the jury=s finding that it failed to perform the
contract based on the failure to construct the boat to comply with ABS
standards.  The trial below involved two other plaintiffs, Chau Nguyen and
Chris Tran (to whom Kennedy Ship had transferred Pham=s hull) who also
sued Kennedy Ship for breach of contract.  The jury found that Kennedy Ship did
not breach the other two contracts with Tran and Nguyen.[8] 
As Kennedy Ship points out, all three contracts contained the same language
regarding ABS standards, the three boats were similarly constructed, and Tran=s boat had
initially been constructed for Pham.  In its original appellate brief, Kennedy
Ship argues it is unlikely the jury determined that the boat constructed under
Pham=s contract and
transferred to Tran had not been built to ABS standards or that Kennedy Ship
was obligated under the contract to obtain ABS certification.  

In a post-submission brief, Kennedy Ship argues we must
reconcile the jury=s various answers in a consistent fashion
because the presumption is always that the jury did not intend conflicting
answers.  Kennedy Ship acknowledges that it has not argued the jury=s answers are
inconsistent, but contends we should presume the jury intended consistent
answers.  Therefore, we should, in conducting our factual sufficiency review,[9]
assume the jury intended its answers to be consistent among the three
plaintiffs.  








To preserve error that the jury=s findings are
inconsistent, the complaining party must raise an objection in the trial court
before the jury is discharged.  Columbia Med. Ctr. of Las Colinas v. Bush ex
rel. Bush, 122 S.W.3d 835, 861 (Tex. App.CFort Worth 2003,
pet. denied); Norwest Mortgage, Inc. v. Salinas, 999 S.W.2d 846, 865
(Tex. App.CCorpus Christi 1999, pet. denied); Durkay v. Madco
Oil Co., 862 S.W.2d 14, 23 (Tex. App.CCorpus Christi
1993, writ denied); Wells v. Wells, No. 14-04-00549-CV, 2006 WL 850844,
at *1 (Tex. App.CHoustson [14th Dist.] Apr. 4, 2006, pet.
filed) (mem. op.).  Kennedy Ship has waived this issue by failing to  raise it
before the trial court discharged the jury and, instead, raising this complaint
for the first time on appeal.  In any event, we have already determined that
the evidence is factually sufficient to support a finding that Kennedy Ship
breached the contract by prematurely asking for payment.  Kennedy Ship=s second issue is
overruled.  

                                       III.  Kennedy Ship=s Excuse

In its third issue, Kennedy Ship claims the jury=s finding that it
was not excused from performance is against the great weight and preponderance
of the evidence.  Because Kennedy Ship challenges the factual sufficiency of an
adverse finding on which it had the burden of proof, it must demonstrate on
appeal that the adverse finding is against the great weight and preponderance
of the evidence.  Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex.
2001) (per curiam).  In reviewing the complaint that the jury=s finding is
against the great weight and preponderance of the evidence, we must consider
and weigh all the evidence, setting aside the verdict only if the evidence is
so weak or if the finding is so against the great weight and preponderance of
the evidence that it is clearly wrong and unjust.  Id.








Kennedy Ship argues it was excused from any breach because
Pham did not make his interim payments, and did not provide adequate assurance
he would pay the $700,000 due on the boat if constructed.  Section 2.609 of the
Uniform Commercial Code,[10]
as adopted in Texas, provides that when reasonable grounds for insecurity arise
with respect to the performance of either party under a contract, the other
party may demand adequate assurance of due performance.  Cook Composites,
Inc. v. Westlake Styrene Corp., 15 S.W.3d 124, 140 (Tex. App.CHouston [14th
Dist.] 2000, pet. dism=d) (citing Tex. Bus. & Com. Code Ann. ' 2.609 (Vernon
1994)).  The insecure party may suspend any performance for which it has not
already received the agreed return until the assurance is received.  Id. 
Kennedy Ship argues the greater weight of the evidence established that it demanded
in writing adequate assurance of performance and once the assurances were not
received, it was entitled to suspend performance.  Kennedy Ship argues 30 days
after the July 23 letter, Pham=s failure to provide assurance constituted
repudiation of the contract.

Kennedy Ship=s argument assumes
all facts it puts forth are true and various payments were due.  However, any
assurance of payment would not have arisen because, as addressed above, the
evidence supports findings that Kennedy Ship (1) had prematurely demanded a
$100,000 payment from Pham on April 12, 2001, (2) had not timely delivered the
boat in June 2001, and (3) had transferred Pham=s hull to
Christopher Tran in May 2001.  Kennedy Ship=s third issue is
overruled.  

                                              IV.  Pham=s Excuse

In its fourth issue, Kennedy Ship contends the evidence is
factually insufficient to support the jury=s finding that
Pham=s breach of the
contract was excused.  Kennedy Ship argues Pham could not use the June 2001
schedule as an excuse for his nonperformance because, after the June 2001
deadline had passed, Pham elected to affirm the agreement and continue to seek
performance, by requesting that it complete the boat and deliver it by December
2001.  

AIf after a party breaches a contract, the
other party continues to insist on performance on the part of the party in
default, the previous breach constitutes no excuse for nonperformance on the
part of the party not in default and the contract continues in force for the
benefit of both parties.@  Houston Belt & Terminal Ry v. J.
Weingarten, Inc., 421 S.W.2d 431, 435 (Tex. Civ. App.CHouston [1st
Dist.] 1967, writ ref=d n.r.e.).  Thus, when one party
materially breaches a contract, the nonbreaching party is forced to elect
between two courses of action, i.e., continuing performance or ceasing
performance.  Chilton Ins. Co. v. Pate & Pate Enters., Inc., 930
S.W.2d 877, 887B88 (Tex. App.CSan Antonio 1996,
writ denied).  Treating the contract as continuing after a breach deprives the
nonbreaching party of any excuse for terminating its own performance.  Id.
at 888.  








As addressed above, the evidence is factually sufficient to
support a jury finding that Kennedy Ship had already transferred the boat under
its contract with Pham to Christopher Tran in May 2001.  Even if Pham stated in
September 2001, that he still wanted the boat under his contract, the subject
matter of the contract was no longer available to Pham.  Kennedy= breach in
transferring the boat under Pham=s contract in May
2001, excused Pham from any further performance.  Therefore, the evidence is
factually sufficient to support a jury finding that Pham is excused for failing
to perform under the contract.  Kennedy Ship=s fourth issue is
overruled.

                                    V.  Jury Charge Instruction

In its fifth
issue, Kennedy argues the trial court erred in refusing to include a requested
jury instruction.  Kennedy Ship complains the jury was not asked to decide who
breached first.  Kennedy Ship contends it was necessary to instruct the jury
when a breach is material and asserts it requested, in substantially correct
wording, the following instruction on material breach:  

In determining the materiality of a failure fully to perform a promise
the following circumstances are influential:  

(a) the extent to which the injured party will obtain the substantial
benefit which he could have reasonably anticipated;

(b) the extent to which the injured party may be adequately compensated
in damages for lack of complete performance;

(c) the extent to which the party failing to perform has already partly
performed or made preparations for performance;

(d) the greater or less hardship on the party failing to perform in
terminating the contract;

(e) the wilful, negligent or innocent behavior of the party failing to
perform;

(f) the greater or
less uncertainty that the party failing to perform will perform the remainder
of the contract.

Advance
Components, Inc. v. Goodstein, 608 S.W.2d 737, 739B40 (Tex. Civ. App.CDallas 1980, writ
ref=d n.r.e.).  








At the charge
conference, the following took place:

MR. BUCKLEY:  There is an instruction on materiality I would ask the
Court be included.  As you know, there are certainly instances where the term Amaterial breach@ is used.  In Mr. Baker=s proffer.  And I would ask the
definition of Amaterial breach@ as contained in Advance
Components, Inc. Vs [sic] Jerald P. Goodstein, in the jury charge, that
begins on 739 of that case and continues on in the indented section through
Subsection F, and for the convenience of the record and with the permission and
consent of Mr. Baker and the Court, I would ask that I be permitted to just
bracket that section from the case and to have the Court Reporter mark that as
an exhibit for this hearing and -- or I could read it word for word into the
record, but if we substitute.

THE COURT:  We will not mark it as an exhibit but put it in with the
proffers.  

MR. BUCKLEY:  I offer that definition on Amateriality@ from Section 235 Restatement of the law of Contracts, Your
Honor.

THE COURT: Okay.[11]

Rule 278 of the Texas Rules of Civil Procedure states AFailure to submit
a definition or instruction shall not be deemed a ground for reversal of the
judgment unless a substantially correct definition or instruction has been
requested in writing and tendered by the party complaining of the judgment.@  Tex. R. Civ. P. 278.  To preserve error,
the complaining party must tender a written request to the trial court for
submission of the instruction, which is in substantially correct wording.  Gerdes
v. Kannamer, 155 S.W.3d 523, 534 (Tex. App.CCorpus Christi
2004, pet. denied).  A ruling is also required to preserve error.  Sears,
Roebuck & Co. v. Abell, 157 S.W.3d 886, 892 (Tex. App.CEl Paso 2005, pet.
denied).  








We find nothing in the record to show that the trial court
ruled on Kennedy Ship=s request and conclude Kennedy Ship has
not preserved this complaint for appellate review.[12] 
Kennedy Ship=s fifth issue is overruled.  

Accordingly, the judgment of the trial court is affirmed.  

 

 

 

 

 

/s/      J. Harvey Hudson

Justice

 

 

 

 

Judgment rendered
and Opinion filed October 5, 2006.

Panel consists of
Justices Hudson, Fowler, and Seymore.









[1]  Pham also brought claims for violations of the Texas
Deceptive Trade Practices Act (ADTPA@), promissory estoppel, fraud, and violations of civil
rights under 42 U.S.C. ' 1981.  Pham also sued Chris Kennedy, individually,
and another company related to Kennedy Ship.  Kennedy also counterclaimed
against Pham for fraudulent inducement.  





[2]  The trial court may conclude a contract is
ambiguous, even in the absence of such pleading by either party, and submit the
ambiguity to the jury if it was tried by consent of the parties.  Sage
Street Assocs. v. Northdale Constr. Co., 863 S.W.2d 438, 445 (Tex. 1993)
(citing Tex. R. Civ. P. 67). 
Pham objected to the trial court=s
determination that the language with regard to ABS standards is ambiguous and
the inclusion of the instruction in the jury charge.  The trial court overruled
Pham=s objection.  Neither Kennedy Ship nor Pham complain
on appeal that the trial court erred in finding the contract provision
regarding ABS standards to be ambiguous and submitting the ambiguity to the
jury.  





[3]  Oxford
American Dictionary and Thesaurus 182 (2003).  





[4]  Merriam-Webster=s
Collegiate Dictionary 423 (11th ed.
2003).  





[5]  Even when used as a naval term, erection means A[t]he process of hoisting into place and joining the
various part=s of a ship=s
hull, machinery, etc.@  Nomenclature of Naval Vessels, Naval Historical
Center, http:// www.history.navy.mil/books/nnv/dh.htm#E (last visited September
19, 2006).





[6]  In a post-submission brief, Kennedy Ship asserts
there is no evidence that Kennedy Ship misrepresented when Pham=s payments were due.  To the contrary, Chris Kennedy
testified:

Q.  All
right.  If you assume with me that the dates on that website are accurate when
this occurred [on] March 18.  Then when you sent Mr. Pham a letter representing
that his hull was fully erect six days before those boats were flipped, then
that would be a misrepresentation on the progress on his hulls, wouldn=t it?

A.  Yes. 

Emphasis added.  





[7]  A jig is Adevice
used to maintain mechanically correct the positional relationship between a
piece of work and the tool or between parts of work during assembly.@  Websters
Ninth New Collegiate Dictionary 649 (1983).  





[8]  Although Tran and Nguyen filed a notice of appeal,
we dismissed their appeal for want of prosecution.  





[9]  In its original appellate brief, Kennedy Ship raised
the argument that the evidence is factually insufficient to support a finding
that it breached its contract with Pham by failing to build the boat to ABS
standards or obtain ABS certification because the jury found against Tran on
this issue.  In its post-submission brief, Kennedy Ship contends we should
assume the jury intended its answers to be consistent among all three
plaintiffs in conducting our legal sufficiency review, in addition to
our factual sufficiency review.  However, we need not address any arguments
raised in Kennedy Ship=s post-submission brief that were not raised in its
original brief.  See Romero v. State, 927 S.W.2d 632, 634 n.2 (Tex.
1996) (stating petitioner failed to preserve issue for review by raising it for
first time post-submission).  





[10]  Tex. Bus.
& Com. Code Ann. ' 2.609 (Vernon
1994).  





[11]  At the charge conference, Kennedy Ship=s trial counsel apparently marked the relevant portion
of a copy of Advance Components, Inc. v. Goodstein and offered it as an
exhibit for the charge conference.  Although the trial court stated that the copy
of the case would be placed Awith the
proffers,@ there is no such copy in the appellate record. 
Kennedy Ship provided this court with a citation to Advance Components, Inc.
v. Goodstein in its appellate brief.  





[12]  Because Kennedy Ship never obtained a ruling on its
request, it is not necessary for us to determine whether Kennedy Ship submitted
the requested instruction in substantially correct wording.